**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:        Justices:
Clifford W. Taylor    Michael F. Cavanagh
                      Elizabeth A. Weaver
                      Marilyn Kelly
                      Maura D. Corrigan
                      Robert P. Young, Jr.
                      Stephen J. Markman

FILED JULY 25, 2007

MICHIGAN CITIZENS FOR WATER
CONSERVATION, R. J. DOYLE, BARBARA
DOYLE, JEFFREY R. SAPP, and SHELLY M.
SAPP,

        Plaintiffs-Appellants/
        Cross-Appellees,

v                             Nos. 130802, 130803

NESTLÉ WATERS NORTH AMERICA INC.,
        Defendant-Appellee/
        Cross-Appellant,

and

DONALD PATRICK BOLLMAN and NANCY
GALE BOLLMAN, also known as PAT BOLLMAN
ENTERPRISES,
        Defendants.

_____

BEFORE THE ENTIRE BENCH

YOUNG, J.

The sole question presented in this case is whether plaintiffs have standing to bring a claim under the Michigan Environmental Protection Act (MEPA)[1] as that claim relates to certain streams, lakes, and wetlands in Mecosta County.

In *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*,[2] we noted that "'environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons "for whom the aesthetic and recreational values of the area will be lessened" by the challenged activity.'"[3] Plaintiffs indisputably have standing to bring a MEPA claim against Nestlé to protect their riparian property rights to Thompson Lake and the Dead Stream. However, plaintiffs have failed to demonstrate that they use the Osprey Lake Impoundment (Osprey Lake) and Wetlands 112, 115, and 301, and that, as a result, their recreational, aesthetic, or other interests have been impaired. Accordingly, pursuant to MCR 7.302(G)(1), in lieu of granting leave to appeal, we affirm the Court of Appeals in part, but we reverse the Court of Appeals holding that plaintiffs have standing to bring a MEPA claim regarding Osprey Lake and

---

[1] MCL 324.1701 *et seq.*

[2] 471 Mich 608; 684 NW2d 800 (2004).

[3] *Id.* at 629, quoting *Friends of the Earth, Inc v Laidlaw Environmental Services (TOC), Inc*, 528 US 167, 183; 120 S Ct 693; 145 L Ed 2d 610 (2000) (citation omitted).

Wetlands 112, 115, and 301, and remand this case to the circuit court for further proceedings consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

This highly publicized case concerns certain interconnected streams, lakes, and wetlands north of the Tri-Lakes region in Mecosta County, Michigan. These bodies of water include Osprey Lake, Thompson Lake, the Dead Stream, and several wetlands that, for purposes of this case, have been enumerated Wetlands 112, 115, and 301. Osprey Lake is a man-made lake created by the damming and flooding of the Dead Stream. An earthen dam on the east end of Osprey Lake separates Osprey Lake and the Dead Stream. The Dead Stream flows southeast where it eventually joins the Tri-Lakes.[4] Just south of Osprey Lake is a small natural lake, Thompson Lake. To the west and north of Osprey Lake are Wetlands 112, 115, and 301.

Defendants Donald and Nancy Bollman own approximately 850 acres of land in an area known as the Sanctuary that surrounds Osprey Lake and several of the enumerated wetlands.[5] The Bollmans have operated the Sanctuary as a private hunting preserve since they acquired the property in the 1970s. They granted

---

[4] The trial court referenced the "Dead Stream wetlands" in addition to the Dead Stream. These wetlands are found in and around the Dead Stream. For purposes of this case, we refer to the Dead Stream itself and its related wetlands collectively as the Dead Stream.

[5] The Bollmans are not part of this appeal.

3

Nestlé the groundwater rights to a 139-acre area on the northern shore of Osprey Lake within the Sanctuary after preliminary tests indicated that the land contained a suitable and reliable source of spring water.[6]

In order to begin pumping and bottling the water, Nestlé also obtained permits from the Michigan Department of Environment Quality (MDEQ) that ensured its compliance with the standards of the Safe Drinking Water Act.[7] In August 2001, the MDEQ issued Nestlé a permit to convert two test wells to production wells and to install water mains, pump stations, and booster stations to transport the spring water to Nestlé's soon-to-be-constructed bottling facility in Stanwood, Michigan. In February 2002, the MDEQ issued another permit, authorizing two additional production wells at the Sanctuary Springs site. The MDEQ permits authorized Nestlé to operate the four wells at a combined maximum pumping rate of 400 gallons per minute. Armed with the required permits, Nestlé commenced pumping operations in 2002.

---

[6] In order for Nestlé to bottle and market its product as spring water, the source had to satisfy the definition of "spring water" established by the federal Food and Drug Administration (FDA).

[7] MCL 325.1001 *et seq*. The Legislature subsequently amended the Safe Drinking Water Act and other legislation to further regulate water diversion and bottling in Michigan. See, e.g., 2006 PA 33; 2006 PA 34; 2006 PA 35; 2006 PA 37. Because these acts did not take effect until after the trial court and the Court of Appeals issued their decisions, we do not address this legislation in this opinion.

Plaintiff Michigan Citizens for Water Conservation (MCWC) is a non-profit corporation of approximately 1,300 members that formed to protect and conserve water resources in Michigan, particularly in Mecosta County. It views Nestlé and its pumping activities as inimical to MCWC's mission. Two hundred sixty-five members are riparian owners in the Tri-Lakes area, including plaintiffs R.J. and Barbara Doyle, who own land on the Dead Stream, and plaintiffs Jeffrey and Shelly Sapp, who own land on Thompson Lake.

MCWC filed suit in June 2001, seeking temporary and permanent injunctive relief against Nestlé. The trial court denied plaintiffs' request for temporary injunctive relief to prevent Nestlé's construction of the Stanwood bottling facility while the parties litigated Nestlé's right to pump spring water from Sanctuary Springs. Later, in November 2001, plaintiffs filed a six-count second amended complaint.[8] Following Nestlé's and plaintiffs' cross-motions for summary disposition, the trial court dismissed all the counts except the common-law groundwater claim and the MEPA claim, which proceeded to trial.

---

[8] Count I requested an injunction to prevent the construction of wells, wellhouses, and pipelines to transport water to the Stanwood facility. Count II alleged that Nestlé violated common-law riparian rights. Count III similarly claimed that the pumping violated common-law rules governing diversion of groundwater. Count IV alleged that Nestlé violated the public trust by withdrawing the spring water. Count V stated that Nestlé's use constituted an unlawful taking of public resources. Count VI claimed that Nestlé's activities violated MEPA. The second amended complaint also added the Doyles and the Sapps as co-plaintiffs.

After a lengthy bench trial, the trial court granted plaintiffs' request for a permanent injunction of Nestlé's pumping activities. In its opinion, the court made elaborate findings of fact identifying what it called the "zone of influence," the "hydrological effects," and the "ecological impacts" of Nestlé's pumping activities.[9] Relying on these factual findings, the court ruled that plaintiffs prevailed on both the common-law groundwater claim and the MEPA claim and that the only appropriate remedy was to grant a permanent injunction.[10]

---

[9] The "zone of influence" included the Dead Stream, Osprey Lake, Thompson Lake, and Wetlands 115, 112, and 301. The "hydrological effects" section of the opinion described the reduced flow and water levels in the lakes, streams, and wetlands that the court attributed to the pumping. The "ecological impacts" section of the opinion summarized the predicted ecological consequences that the court causally linked to the reduced flow and water level in those bodies of water.

[10] With respect to the common-law groundwater claim, the court found that this case involved an unprecedented intersection of Nestlé's groundwater rights with plaintiffs' riparian rights. After reviewing Michigan common law in this area, the court developed a test that, if groundwater and riparian rights clash and a hydrological connection is proven, riparian rights take priority above groundwater rights. If the groundwater use removes the water from the watershed, then any such use may not reduce natural flow to a riparian body. Applying this test, the court concluded that Nestlé's withdrawals of spring water impaired plaintiffs' riparian rights.

With respect to the MEPA claim, the court found that plaintiffs established an unrebutted prima facie case that Nestlé's pumping activities violated environmental standards drawn from the inland lakes and streams act, MCL 324.30101 *et seq.*, and the wetland protection act, MCL 324.30113 *et seq.*

Both plaintiffs and Nestlé appealed and, in a published opinion, the Court of Appeals affirmed in part, reversed in part, and remanded to the trial court.[11] Appealing the MEPA claim, Nestlé argued that plaintiffs lacked standing to bring that claim with respect to Osprey Lake and Wetlands 112, 115, and 301.[12] Judges White and Murphy, forming the majority on the standing question, disagreed with Nestlé. Holding that plaintiffs had standing "with respect to all the natural resources at issue," Judge Murphy wrote that

> plaintiffs have standing because of the complex, reciprocal nature of the ecosystem that encompasses the pertinent natural resources noted above and because of the hydrologic interaction, connection, or interrelationship between these natural resources, the springs, the aquifer, and defendant Nestlé's pumping activities, whereby impact on one particular resource caused by Nestlé's pumping necessarily affects other resources in the surrounding area. Therefore, although there was no evidence that plaintiffs actually used or physically participated in activities on the Osprey Lake impoundment and wetlands 112, 115, and 301, environmental injuries to those natural

[11] *Michigan Citizens for Water Conservation v Nestlé Waters North America Inc*, 269 Mich App 25; 709 NW2d 174 (2005). Before Nestlé's appeal of right, the Court of Appeals granted Nestlé's requested stay of the injunction and set a maximum pump rate of 250 gallons per minute. That rate was reduced to 200 gallons per minute after the Court of Appeals issued its opinion.

[12] Nestlé also appealed the common-law groundwater claim. The panel adopted a different test from that applied by the trial court. Derived from earlier Michigan cases, this "reasonable use" balancing test required a case-by-case application of principles of ensuring fair participation, protecting only reasonable uses, and prohibiting only unreasonable harms. See, e.g*., Dumont v Kellogg*, 29 Mich 420 (1874); *Maerz v United States Steel Corp*, 116 Mich App 710; 323 NW2d 524 (1982). The Court of Appeals concluded that under this test Nestlé's pumping at 400 gallons per minute was unreasonable. It remanded this issue to the trial court to determine the appropriate level of pumping.

resources play a role in any harm caused to the Dead Stream, the Dead Stream's wetlands, and Thompson Lake, which are used by and adjacent to property owned by plaintiffs and not the subject of a standing challenge.[13]

Judge Smolenski dissented. He would have found that plaintiffs lacked standing with respect to Osprey Lake and Wetlands 112, 115, and 301 because plaintiffs did not use those areas, so they could not demonstrate that they had suffered or would suffer a concrete or particularized injury distinct from that of the public generally.[14] Judge Smolenski also would have declared unconstitutional MCL 324.1701(1),[15] which authorizes "any person" to bring a MEPA claim.[16] He considered that provision an unlawful attempt by the Legislature to confer standing broader than the constitutional limits set forth in *Lee v Macomb Co Bd of Comm'rs*,[17] and *Nat'l Wildlife*.[18]

---

[13] *Michigan Citizens,* 269 Mich App at 113 (opinion of Murphy, P.J.).

[14] *Id*. at 83.

[15] MCL 324.1701(1) states:

>     The attorney general or any person may maintain an action in the circuit court having jurisdiction where the alleged violation occurred or is likely to occur for declaratory and equitable relief against any person for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction.

[16] *Michigan Citizens,* 269 Mich App at 87.

[17] 464 Mich 726; NW2d 900 (2001).

[18] The Court of Appeals also resolved other issues. It rejected defendant's argument that the trial court's factual findings were clearly erroneous and that the trial court abused its discretion when it refused to grant defendant's request to reopen the proofs or supplement the record. It also affirmed the trial court's

(continued…)

Both parties sought leave to appeal in this Court. We ordered oral argument on the applications, directing the parties to address only "whether the plaintiffs have standing under *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608 (2004), to bring claims related to the Osprey Lake impoundment and wetlands 112, 115, and 301."[19] Hence, we limit our decision to the issue of standing. We do not pass on the merits of the other issues raised on appeal.

## II. STANDARD OF REVIEW

Whether a party has standing is a question of law that we review de novo.[20]

## III. ANALYSIS

### A. STANDING

This Court recently explained in *Michigan Chiropractic Council v Comm'r of the Office of Financial & Ins Services*,[21] that

───────────────────────

(…continue)

dismissal of plaintiffs' public trust claim. Additionally, the Court of Appeals agreed with defendant that the trial court erred by granting plaintiffs' motion for costs as prevailing parties.

Judge White also filed a separate opinion pertaining to a matter unrelated to the standing issue decided in this case.

[19] 477 Mich 892 (2006).

[20] *Lee*, 464 Mich at 734.

[21] 475 Mich 363, 369-370; 716 NW2d 561 (2006).

[o]ur tripartite system of government is constitutionally established in both our state and federal constitutions.  US Const, art III, § 1 confers upon the courts only "judicial power"; US Const, art III, § 2 limits the judicial power to "[c]ases and [c]ontroversies."  Similarly, our state constitution, Const 1963, art 3, § 2, provides:

"The powers of government are divided into three branches: legislative, executive and judicial.  No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution."

The powers of each branch are outlined in the Michigan Constitution, which assigns to the Legislature the task of exercising the "legislative power," the Governor the task of exercising the "executive power," and the judiciary the task of exercising the "judicial power."[22]

Standing is an indispensable doctrine rooted in our constitution and the tripartite system of government it prescribes.  We vigilantly enforce principles of standing in order to vindicate the separation of legislative, executive, and judicial powers among the coordinate branches of government to which those respective powers have been committed.  Indeed, "neglect of [standing] would imperil the constitutional architecture" carefully constructed by its drafters and ratified by the people.[23]  To neglect standing would empty the phrases "executive power,"

---

[22] See also Const 1963, art 4, § 1 (vesting the "legislative power" in a senate and a house of representatives); Const 1963, art 5, § 1 (vesting the "executive power" in the governor); Const 1963, art 6, § 1 (vesting the "judicial power . . . exclusively in one court of justice").

[23] *Lee*, 464 Mich at 735.  See generally *Nat'l Wildlife*, 471 Mich at 612-628 (thoroughly discussing standing, separation of powers, and the proper exercise of "judicial power").

"legislative power," and "judicial power" of their intended significance and render the separation of powers demanded by Const 1963, art 3, § 2 meaningless. The purposely drawn boundaries within our tripartite government would vanish, removing the impediments that were intended to prevent one branch of government from exercising powers exclusively vested in the other, coequal branches.

As part of this endeavor to preserve separation of powers, the judiciary must confine itself to the exercise of the "judicial power" and the "judicial power" alone. "Judicial power" is an undefined phrase in our constitution, but we noted in *Nat'l Wildlife* that

> [t]he "judicial power" has traditionally been defined by a combination of considerations: the existence of a real dispute, or case or controversy; the avoidance of deciding hypothetical questions; the plaintiff who has suffered real harm; the existence of genuinely adverse parties; the sufficient ripeness or maturity of a case; the eschewing of cases that are moot at any stage of their litigation; the ability to issue proper forms of effective relief to a party; the avoidance of political questions or other non-justiciable controversies; the avoidance of unnecessary constitutional issues; and the emphasis upon proscriptive as opposed to prescriptive decision making. [471 Mich at 614-615.]

We went on in *Nat'l Wildlife* to distill this litany of considerations arising from the proper exercise of the "judicial power," and we determined that "the most critical

11

element" is "its requirement of a genuine case or controversy between the parties, one in which there is a real, not a hypothetical, dispute."[24]

Steadfast enforcement of standing principles and separation of powers demands remarkable judicial self-restraint. Before his appointment to the United States Supreme Court, Chief Justice John Roberts wrote that the doctrine of standing "implement[s] the Framers' concept of 'the proper—and properly limited—role of the courts in a democratic society'" so that "[s]tanding is thus properly regarded as a doctrine of judicial self-restraint."[25] He noted that "[s]eparation of powers is a zero-sum game" and the doctrine of standing "ensures that the court is carrying out *its* function of deciding a case or controversy," and not fulfilling the responsibilities of the other branches.[26] More recently, writing for the Court in *DaimlerChrysler v Cuno*,[27] Chief Justice Roberts argued that a court has "no business" deciding a dispute that is not a proper case or controversy and quoted Chief Justice John Marshall's observation that

---

[24] *Nat'l Wildlife*, 471 Mich at 615.

[25] See Comment: *Article III limits on statutory standing*, 42 Duke L J 1219, 1220, 1221 (1993); see also Scalia, *The doctrine of standing as an essential element of the separation of powers*, 17 Suffolk U L R 881, 890-893 (1983) (discussing the relationship between separation of powers and the doctrine of standing).

[26] *Article III Limits*, 42 Duke L J at 1230.

[27] __ US __; 126 S Ct 1854, 1861; 164 L Ed 2d 589 (2006), quoting 4 Papers of John Marshall 95 (C Cullen ed, 1984).

"[i]f the judicial power extended to every *question* under the constitution it would involve almost every subject proper for legislative discussion and decision; if to every *question* under the laws and treaties of the United States it would involve almost every subject on which the executive could act. The division of power [among the branches of government] could exist no longer, and the other departments would be swallowed up by the judiciary."

Thus, the court that earnestly adheres to the doctrine of standing must exercise self-discipline to resist the temptation of usurping power from the other branches. The court that is willing to compromise the doctrine of standing and reach beyond the "judicial power" lacks such discipline.

Standing ensures that a genuine case or controversy is before the court. It "'requires a demonstration that the plaintiff's substantial interest will be detrimentally affected in a manner different from the citizenry at large.'"[28] To successfully allege standing, a plaintiff must prove three elements.

"First, the plaintiff must have suffered an 'injury in fact'–an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical."' Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . traceable to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court.' Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" [*Nat'l Wildlife*, 471 Mich at 628-629, quoting *Lee,* 464

---

[28] *Lee,* 464 Mich at 738-739, quoting *House Speaker v Governor*, 441 Mich 547, 554; 495 NW2d 539 (1993).

13

Mich at 739, quoting *Lujan v Defenders of Wildlife*, 504 US 555, 560-561; 112 S Ct 2130; 119 L Ed 2d 351 (1992).][29]

Where the plaintiff claims an injury related to the environment, this Court lacks the "judicial power" to hear the claim if the plaintiff cannot aver facts that he has suffered or will imminently suffer a concrete and particularized injury in fact. In this context, "'environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons "for whom the aesthetic and recreational values of the area will be lessened" by the challenged activity.'"[30]

---

[29] Concerning Justice Cavanagh's dissent, we are perplexed about how he would analyze standing cases. The United States Supreme Court decision in *Lujan v Defenders of Wildlife*, 504 US 555; 112 S Ct 2130; 119 L Ed 2d 351 (1992), is the most significant recent judicial pronouncement on standing. In *Detroit Fire Fighters Ass'n v Detroit*, 449 Mich 629, 650-651; 537 NW2d 436 (1995), Justice Cavanagh affirmatively cited *Lujan* to conclude that a labor union had standing. In *Lee*, 464 Mich at 750, joining Justice Kelly's dissent, he again "agree[d] with the majority's adoption of the *Lujan* test." Then, in *Nat'l Wildlife,* 471 Mich at 676, Justice Cavanagh "disavow[ed]" his previous position and concluded that "*Lujan* should not be used to determine standing in this state." Finally, in this case, he favorably cites *Lujan*, *post* at 2, while also joining a dissent that concludes that *Lujan* is inapplicable in this state. In short, on an issue of enormous constitutional consequence, Justice Cavanagh has, without much explanation, adopted a variety of seemingly inconsistent positions. Under these circumstances, it would seem to behoove Justice Cavanagh to demonstrate somewhat greater reservation than he does before joining a dissenting opinion in which the political motivations of the majority justices are called into question without justification—justices who have consistently adhered to the same constitutional position on standing over the years without regard to the parties or interests involved. See, e.g., *Lee, supra; Nat'l Wildlife, supra; Michigan Chiropractic Council, supra; Rohde, infra*.

[30] *Nat'l Wildlife*, 471 Mich at 629, quoting *Laidlaw*, 528 US at 133 (citations omitted).

14

An injury in fact is established when the defendant's activities directly affected the plaintiff's recreational, aesthetic, or economic interests.[31]

## B. APPLICATION

Plaintiffs MCWC and the Doyles and Sapps must satisfy the three elements of standing to pursue a MEPA claim against Nestlé. In other words, they must have (1) suffered an injury in fact (2) causally connected to Nestlé's conduct that (3) can be redressed by a favorable decision. MCWC, as a nonprofit organization, must satisfy our requirement for organizational standing. A nonprofit organization has standing to bring suit in the interest of its members if its members would have standing as individual plaintiffs.[32]

Defendant concedes, and we agree, that plaintiffs have standing to bring a MEPA claim with respect to the Dead Stream and Thompson Lake, because the Doyles and the Sapps enjoy riparian property rights to the Dead Stream and Thompson Lake, respectively. Therefore, if Nestlé's pumping activities have impaired their riparian property rights, they clearly have suffered an injury in fact. Moreover, because these individual plaintiffs are members of MCWC, they confer organizational standing on MCWC with respect to the Dead Stream and Thompson Lake.

---

[31] *Laidlaw,* 528 US at 184.

[32] *Nat'l Wildlife*, 471 Mich at 629; *Trout Unlimited, Muskegon White River Chapter v White Cloud*, 195 Mich App 343, 348; 489 NW2d 188 (1992).

However, turning to Osprey Lake and Wetlands 112, 115, and 301, the record below does not indicate that plaintiffs used or had access to these areas or that they enjoyed a recreational, aesthetic, or economic interest in them. Plaintiffs failed to establish that they have a substantial interest in these areas, detrimentally affected by Nestlé's conduct, that is distinct from the interest of the general public. The absence of a concrete, particularized injury in fact is fatal to plaintiffs' standing to bring a MEPA claim with respect to Osprey Lake and Wetlands 112, 115, and 301.

To be clear, we are refining, not dismissing, plaintiffs' MEPA claim. Plaintiffs enjoy the full protection that MEPA affords to vindicate their riparian property interests. Thus, they have standing insofar as Nestlé's pumping activities inflicted an injury in fact with respect to the Dead Stream and Thompson Lake. However, plaintiffs cannot similarly establish standing with respect to Osprey Lake and Wetlands 112, 115 and 301.[33]

In reaching this conclusion, we reject the Court of Appeals "interconnectedness" theory of standing as inconsistent with *Lee* and *Nat'l Wildlife*. The trial court found as fact that many of the streams, lakes and wetlands

---

[33] Of course, in the process of protecting plaintiffs' riparian rights in the Dead Stream and Thompson Lake, a successful MEPA claim may have the incidental effect of protecting Osprey Lake and Wetlands 112, 115, and 301 because the common source of the environmental harm that the trial court found in the entire region was Nestlé's pumping activity.

in the Tri-Lakes area are joined by an inextricable, hydrological link. Drawing

from these facts, the Court of Appeals held that

> plaintiffs have standing because of the complex, reciprocal nature of the ecosystem that encompasses the pertinent natural resources noted above and because of the hydrologic interaction, connection, or interrelationship between these natural resources, the springs, the aquifer, and defendant Nestlé's pumping activities, whereby impact on one particular resource caused by Nestlé's pumping necessarily affects other resources in the surrounding area. *Therefore, although there was no evidence that plaintiffs actually used or physically participated in activities on the Osprey Lake impoundment and wetlands 112, 115, and 301*, environmental injuries to those natural resources play a role in any harm caused to the Dead Stream, the Dead Stream's wetlands, and Thompson Lake, which are used by and adjacent to property owned by plaintiffs and not the subject of a standing challenge. [*Michigan Citizens*, 269 Mich App at 113 (emphasis added).]

The flaw in this "interconnectedness" theory of standing is that it permits plaintiffs

to evade their burden to establish an injury in fact. As the United States Supreme

Court stated in *Friends of the Earth, Inc v Laidlaw Environmental Services

(TOC)*,[34] the relevant inquiry in standing analysis is not whether the environment

suffered injury, but whether the plaintiff suffered injury. If the hydrological links

are as the trial court found, then a reduced flow or water level at one point in the

interconnected hydrological system will have a measurable effect elsewhere in that

system. But plaintiffs must still establish how *they* have suffered a concrete and

particularized injury in fact within this interrelated ecosystem. The environmental

---

[34] 528 US 167, 181; 120 S Ct 693; 145 L Ed 2d 610 (2000).

peculiarities of the Tri-Lakes area, or any ecosystem for that matter, do not obviate constitutional standing requirements.

Plaintiffs defend the Court of Appeals standing analysis by arguing that all of the harm in this case is singularly traceable to Nestlé's pumping activity, and so their single MEPA claim cannot be divided into multiple causes of action. They emphasize that they have raised *one* MEPA claim to address the multitude of harms allegedly caused by Nestlé's pumping activities and seek *one*, indivisible remedy: to halt Nestlé's withdrawals. According to plaintiffs, an entire ecosystem that includes Osprey Lake and Wetlands 112, 115, and 301 has been harmed.

Plaintiffs' argument misses the basic point that *plaintiffs* are the focus of the standing inquiry, not the Tri-Lakes region. We reject plaintiffs' bootstrapping approach to standing under which, as long as they have standing to redress *their* injury in fact, they have standing to redress all injuries conceivably related to their injury in fact. No matter how pervasive the environmental damage in an ecosystem, plaintiffs must still successfully and succinctly establish their injury in fact. Plaintiffs satisfy this requirement for the Dead Stream and Thompson Lake, but not Osprey Lake and Wetlands 112, 115, and 301.

The caselaw that plaintiffs cite to support their position actually confirms our analysis. The Supreme Court cases cited by plaintiffs consistently required

that the plaintiff demonstrate an injury in fact in order to bring suit.[35]  Indeed, in *Lujan v Defenders of Wildlife*,[36] the Court discredited an "ecosystem nexus" approach to standing that would grant standing to "any person who uses *any part* of a 'contiguous ecosystem' adversely affected . . . even if the activity is located a great distance away."  The Court also held that "a plaintiff claiming injury from environmental damage must use the area affected by the challenged activity and not an area roughly 'in the vicinity' of it."[37]  Yet, in this case, the Court of Appeals endorsed and plaintiffs advocate precisely the "ecosystem nexus" approach that the United States Supreme Court rejected in *Lujan*.  All the water on the planet is connected in some way through the hydrological cycle.  Were the "ecosystem nexus" approach consistent with the operant doctrine of standing, it would justify the standing of anyone but a Martian to contest water withdrawals occurring in Michigan.  Traditional standing principles would be obliterated.

Plaintiffs also rely on *Cantrell v City of Long Beach*.[38]  In *Cantrell*, the plaintiff birdwatchers brought several claims against the defendants arising from

---

[35] See, e.g., *Sierra Club v Morton*, 405 US 727; 92 S Ct 1361; 31 L Ed 2d 636 (1972); *Warth v Seldin*, 422 US 490; 95 S Ct 2197; 45 L Ed 2d 343 (1975).

[36] 504 US at 555, 565 (emphasis in original).

[37] *Id*. at 565-566.

[38] 241 F3d 674 (CA 9, 2001).

the defendants' plan to demolish a naval station. The gist of the birdwatchers' complaint was that this demolition would also destroy bird habitats on the site. The Ninth Circuit Court of Appeals reversed the district court's decision that the birdwatchers lacked standing to pursue a National Environmental Policy Act (NEPA) claim, holding that the birdwatchers sufficiently alleged an injury in fact because the defendants' actions impaired the birdwatchers' recreational and aesthetic interest in viewing these bird habitats. The Ninth Circuit did not decide whether the birdwatchers had a legal right to enter the naval station because "their desire to view the birds at the Naval Station from publicly accessible locations outside the station is an interest sufficient to confer standing."[39] Plaintiffs argue that, under *Cantrell*, they need not *own* Osprey Lake or Wetlands 112, 115, or 301, or possess a right to access them, to establish an injury in fact if those properties suffer environmental damage.

In *Nat'l Wildlife*, we held that affidavits from individuals alleging that their activities of birdwatching, canoeing, biking, hiking, skiing, fishing, and farming would be impaired by the defendant's activities were sufficient to meet the standing test articulated in *Lee*.[40] Therefore, without endorsing *Cantrell* but accepting arguendo that impairment of aesthetic and recreational interests such as

---

[39] *Id.* at 680-681.

[40] *Nat'l Wildlife*, 471 Mich at 630.

birdwatching can satisfy constitutional standing, we note that plaintiffs' claim would fail even under *Cantrell*. In *Cantrell*, the birdwatchers *did* allege an injury in fact—their recreational and aesthetic interests in bird watching were impaired. In this case, plaintiffs have not similarly alleged an impairment of an aesthetic or recreational interest in Osprey Lake and Wetlands 112, 115, and 301.

Plaintiffs and their supporting amici[41] claim that two unique and related considerations render traditional standing analysis inappropriate in this case. First, they argue that Const 1963, art 4, § 52 establishes the public interest in the protection of Michigan's natural resources and that Const 1963, art 4, § 52 directs the Legislature to enact appropriate legislation to protect these natural resources.[42] Second, plaintiffs and amici argue that the Legislature carried out this constitutional directive by enacting MEPA, in which the Legislature created a

---

[41] In response to our order granting oral argument on the application, MDEQ and, collectively, the National Wildlife Federation, Michigan United Conservation Clubs, Tip of the Mitt Watershed Council, Pickerel-Crooked Lakes Association, and Burt Lake Preservation Association filed amicus briefs supporting plaintiffs.

[42] See Const 1963, art 4, § 52, which declares that "[t]he conservation and development of the natural resources of the state are . . . of paramount public concern in the interest of the health, safety and general welfare of the people." The provision then directs the Legislature to "provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction."

legally cognizable right to clean air, water, and other natural resources that "any person" can vindicate if that right is invaded.[43]

We disagree that either of these considerations changes the standing inquiry. Simply put, neither Const 1963, art 4, § 52 nor MCL 324.1701(1) lightens a plaintiff's burden to satisfy traditional standing requirements in environmental cases. In *Nat'l Wildlife*, we noted that "art 4, § 52 does not authorize the Legislature to ignore all other provisions of the constitution in enacting laws to protect the environment."[44] The elements of individual and organizational standing must be met in environmental cases as in every other lawsuit, unless the constitution provides otherwise.[45] Nothing in the language of this provision indicates that the paramount public concern for the conservation and development of Michigan's natural resources and the Legislature's responsibility to protect these resources compromises the principles of standing and renders them inapplicable to environmental plaintiffs.

Similarly, simply by enacting MCL 324.1701(1), the Legislature cannot compel this Court to exercise the "judicial power" beyond constitutional limits any

---

[43] MCL 324.1701(1).

[44] 471 Mich at 636.

[45] Cf. Const 1963, art 9, § 32 ("Any taxpayer of the state shall have standing to bring suit . . . to enforce the provisions of Sections 25 through 31 . . . .").

(continued…)

more than this Court can legitimately enlarge or diminish the Legislature's constitutionally prescribed "legislative power."[46] We agree with plaintiffs and amici that the Legislature holds the power to create statutory causes of action. However, the exercise of this power must still respect separation of powers.[47] Moreover, plaintiffs' belief that MEPA authorizes citizen suits does not change the calculus. As we outlined in *Nat'l Wildlife* and more recently in *Rohde*, citizen suits historically have conferred on the litigant a concrete private interest in the outcome of the suit, and therefore involved only those who have suffered either a direct or assigned injury in fact.[48] Plaintiffs have not established their concrete interest in Osprey Lake and Wetlands 112, 115, and 301.

_____

(…continue)

[46] *Nat'l Wildlife*, 471 Mich at 636-637. See also *Rohde v Ann Arbor Pub Schools*, 479 Mich __ ; __ NW2d__ (Docket No. 128768, decided July 25, 2007) (holding MCL 129.61 unconstitutional because it grants any resident taxpayer the right to sue even if the resident taxpayer fails to satisfy the three-part test for standing).

[47] Defendant and its supporting amici urge this Court to find MCL 324.1701(1) unconstitutional because it is an attempt by the Legislature to confer broader standing than what is constitutionally permitted. We decline this invitation. Although plaintiffs do not have standing with respect to every body of water identified by the trial court, they do have standing with respect to Thompson Lake and the Dead Stream, as defendant concedes. Therefore, this Court has no reason to consider the constitutionality of MCL 324.1701(1) because it is unnecessary to the resolution of this case.

[48] *Nat'l Wildlife*, 471 Mich at 636-637; see also *Rohde,* 479 Mich at __.

## IV. RESPONSE TO JUSTICE KELLY

Justice Kelly quotes the United States Supreme Court's statement from *Warth* that "so long as [the standing] requirement is satisfied, persons to whom [the Legislature] has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights and interests of others, and, indeed, may invoke the general public interest in support of their claim."[49]   She reasons by analogy from this statement that because plaintiffs have standing with respect to the Dead Stream and Thompson Lake, they can assert the interests of the general public and challenge the total effects of defendant's pumping, including any effects on Osprey Lake and Wetlands 112, 115, and 301.

We conclude that Justice Kelly's reliance on that statement from *Warth* is misplaced.  First, the above-quoted statement from *Warth* is taken out of context by Justice Kelly.  *Warth* simply does not stand for the proposition that a plaintiff may bring a claim asserting the general public interest where the plaintiff lacks constitutional standing to bring that claim himself.[50]   *Warth* plainly stated that

---

[49] *Post* at 6, quoting *Warth*, 422 US at 501.

[50] Justice Kelly's position would, in fact, create a significant loophole in standing doctrine.  Assuming that plaintiffs could assert the general public's interest in preventing environmental destruction in support of their MEPA claim, it is unclear how the general public interest, as Justice Kelly defines it in this case, could confer *standing* that plaintiffs otherwise lack with respect to Osprey Lake and Wetlands 112, 115, and 301.

plaintiffs "may invoke the general public interest *in support of their claim*," not that plaintiffs could bring a claim under the banner of the public interest even though *they* lacked standing to raise that claim.[51]  Had the *Warth* Court held to the contrary, it would have created a glaring, untenable exception to Article III's case or controversy requirement inconsistent with its own decision.  Such a holding also would have flatly conflicted with *Sierra Club v Morton*,[52] where the Court held that the plaintiffs lacked standing to challenge the commercial development of a national forest because the plaintiffs failed to allege how the development would injure the Sierra Club or its members.  Thus, the plaintiffs could not bring suit as a "representative of the public" where they lacked individual standing.

The above-quoted statement from *Warth* was also dictum.  In the sentence immediately preceding that statement, the Court emphasized that even where Congress lowered the prudential bar to standing for a plaintiff, the minimum Article III requirements remain and the plaintiff "still must allege a distinct and palpable injury to himself."[53]  It was in the context of this discussion that the Court ultimately held that none of the plaintiffs had standing to sue because none of the

---

[51] *Warth*, 422 US at 501 (emphasis added).  See also *Cuno*, 126 S Ct at 1867 ("[A] plaintiff must demonstrate standing for each claim he seeks to press."); *Laidlaw*, 528 US at 185 ("[A] plaintiff must demonstrate standing separately for each form of relief sought.").

[52] 405 US 727; 92 S Ct 1361; 31 L Ed 2d 636 (1972).

[53] *Warth*, 422 US at 501.

plaintiffs met the threshold standing requirements to bring suit against the defendants. Thus, its brief statement about the role of the "general public interest" in standing analysis was not essential to its decision.

In this case, plaintiffs cannot allege an injury in fact with respect to Osprey Lake and Wetlands 112, 115, and 301. It follows that they cannot bring a MEPA claim with respect to those particular bodies of water because they cannot satisfy the minimum threshold for standing. Thus, we fail to see how plaintiffs could invoke the general public interest "*in support of*" a MEPA claim that it could never bring with respect to Osprey Lake and Wetlands 112, 115, and 301. Some of the confusion in this case might stem from the fact that the alleged widespread environmental damage affecting the several bodies of water was reputedly traceable to Nestlé's pumping activities. Thus, if true, as a practical matter, injunctive relief ordering Nestlé to reduce or to stop its pumping activities could benefit Osprey Lake and Wetlands 112, 115, and 301. Nevertheless, we cannot confuse the potential effect of the remedy with plaintiffs' constitutional burden to prove that they have standing to bring a claim.

We have not, as Justice Kelly insists, selectively adopted favorable portions of federal standing law and ignored others. Rather, we have parsed the language from *Warth* carefully and given attention to its proper context. It is Justice Kelly who, by contrast, selectively relied on dictum in *Warth*. Although Justice Kelly

26

elevates this dictum to a foundational principle of federal standing jurisprudence,[54] we, for the aforementioned reasons, repudiate her conclusion.[55]

[54] Justice Kelly overstates the significance that the "general public interest" language from *Warth* enjoys in federal standing jurisprudence. The United States Supreme Court in *Sierra Club*, one of the cases on which *Warth* relied, stated that a party with standing "may argue the public interest in support of his claim that [a federal] agency has failed to comply with its statutory mandate." *Sierra Club*, 405 US at 737. The *Sierra Club* Court focused on the standing requirements for a party seeking judicial review of federal agency actions. Thus, *Warth* clearly drew its dictum about the general public interest from the context of administrative law. Moreover, every post-*Warth* federal district court and circuit court case cited by Justice Kelly involved a federal agency's alleged failure to fulfill its statutorily prescribed administrative duties, which indicates that *Warth*'s dictum has not been expanded outside its original administrative law context. Assuming that we were bound to follow this line of cases, which Justice Kelly acknowledges that we are not, it would not have any bearing on this case in any event because plaintiffs have not alleged that a state agency such as MDEQ has neglected its statutory responsibilities. Finally, we are unaware of any United States Supreme Court decision, particularly one decided after *Lujan*, that has applied the dictum from *Warth* in the manner advocated by Justice Kelly. Indeed, two current members of the Court, Justices Scalia and Thomas, have recently criticized other language from *Warth* as dicta. See *Hein v Freedom from Religion Foundation*, *Inc*, ___ US ___; 127 S Ct 2553; 168 L Ed 2d 424 (2007) (Scalia, J. concurring in the judgment) (criticizing earlier Supreme Court cases that described the prohibition on generalized grievances as merely a prudential bar rather than an Article III standing consideration and characterizing *Warth* as the "fountainhead" of this dicta). Thus, we would be wise to carefully and critically consider dicta from *Warth*, and we believe we have done so.

[55] However, if *Warth* truly stood for the proposition urged by Justice Kelly, it would violate the separation of powers principles upon which Michigan's constitutional standing requirements rest and should be rejected on that ground.

## V. RESPONSE TO JUSTICE WEAVER

Justice Weaver's dissent merely reiterates objections she lodged in response to our prior standing cases—objections that this Court has considered and rejected. Because there is little to add to our previous colloquies with the dissenter (other than to direct the reader to our analyses in *Lee* and *Nat'l Wildlife*), we will briefly respond.

Justice Weaver persists in her argument that the textual differences between the federal constitution and our state constitution prove that the exercise of "judicial power" or the doctrine of separation of powers in our constitution means something radically different than it does under the federal constitution.[56] This argument that separation of powers should be understood differently in the Michigan Constitution because the words "case" and "controversy" are not in our constitution suggests to us that Justice Weaver fundamentally misunderstands the doctrine of separation of powers. She refuses to accept that there is a

---

[56] See *Nat'l Wildlife*, 471 Mich at 625-628. Interestingly, the Constitution of the Commonwealth of Massachusetts, which predated our federal constitution, articulates the principle of separation of powers in language quite similar to 1963 Const, art 3 § 2. See Scalia, *The doctrine of standing as an essential element of the separation of powers*, 17 Suffolk U L R 881 (1983) (quoting pt 1, art XXX of the Massachusetts Constitution, which states that "the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers or either of them; the judicial shall never exercise the legislative and executive powers, or either of them . . . .").

constitutional limit on the Legislature's authority to expand "judicial power" in the

area of standing. In response, we stated in *Nat'l Wildlife* that

> [a]s the Michigan Constitution makes clear, the duty of the judiciary is to exercise the "judicial power," and, in so doing, to respect the separation of powers. While as a *general proposition*, the proper exercise of the "judicial power" will obligate the judiciary to give faithful effect to the words of the Legislature—for it is the latter that exercises the "legislative power," not the judiciary—such effect cannot properly be given when to do so would contravene the constitution itself. Just as the judicial branch owes deference to the legislative branch when the "legislative power" is being exercised, so too does the legislative branch owe deference to the judicial branch when the exercise of the "judicial power" is implicated. Even with the acquiescence of the legislative and executive branches, the judicial branch cannot arrogate to itself governmental authority that is beyond the scope of the "judicial power" under the constitution. The "textual" approach of [Justice Weaver] is a caricatured textualism, in which the Legislature is empowered to act *beyond* its authority in conferring powers upon other branches that are also *beyond* their authority. [*Nat'l Wildlife*, 471 Mich at 637 (citations omitted; emphasis in original).]

Equally perplexing is Justice Weaver's continued insistence that by

*refraining* from exercising our "judicial power" where plaintiffs fail to allege an

injury in fact, we have actually failed to show judicial restraint. Such reasoning

turns "reality on its head."[57] In response, we simply reiterate that by acting within

the limits of the "judicial power" accorded by our constitution, we have not

---

[57] *Nat'l Wildlife*, 471 Mich at 639; see also text and accompanying footnotes at pp 12-13 of this opinion.

expanded our power and we have not encroached on the powers granted to the other branches of government.[58]

Her doctrinal misunderstandings aside, Justice Weaver's core "political point" is that, in insisting on constitutional standing requirements, we have eviscerated environmental laws intended to protect Michigan's natural resources, leaving Michigan residents helpless to protect those resources threatened by environmental harm. Needless to say, her bleak, apocalyptic visions are false. Our holding today does not strip the Legislature or Michigan residents of their ability to protect this state's natural resources. What we have done is recognized an established constitutional line on our judicial authority to adjudicate what would otherwise be public policy-oriented lawsuits brought by persons who have no immediate stake in the controversy.

Environmental laws, such as MEPA (or any statutory law for that matter), may be vindicated by persons who have suffered a real injury in fact and thus have a stake in the controversy. Such is the case here with respect to plaintiffs' MEPA claim to protect the Dead Stream and Thompson Lake. Moreover, environmental laws are also always enforceable by the executive branch through entities such as the MDEQ. If the people are unhappy with how the executive branch fulfills its enforcement functions, the remedy is not a lawsuit, but a political one at the ballot box.

---

[58] *Nat'l Wildlife*, 471 Mich at 639-640.

Finally, just as we stated in *Nat'l Wildlife*, we have yet to find any support, textual or otherwise, other than Justice Weaver's assertion, for her contention that Const 1963, art 4, § 52 renders standing principles inapplicable in matters of environmental concern.[59]  In *Nat'l Wildlife*, we noted that with respect to the mandates stated in constitutional provisions such as art 4, § 52, "it is implicit . . . that the Legislature is to pursue these goals *by appropriate means*" rather than by unconstitutional methods.[60]  Therefore, there is no reason to presume that the Legislature can discard standing requirements in order to carry out its mandate in art 4, § 52, and Justice Weaver fails to provide one.

## VI.  CONCLUSION

Plaintiffs have standing to bring a MEPA claim against Nestlé to protect their riparian property rights in Thompson Lake and the Dead Stream.  However, plaintiffs have not alleged an injury in fact with respect to the Osprey Lake Impoundment and Wetlands 112, 115, and 301 because there is no evidence that they use these areas and that their recreational, aesthetic, or economic interests have been impaired by Nestlé's pumping activities.  Accordingly, we affirm the Court  of Appeals in part,  but we reverse the Court of Appeals holding with regard

---

[59] *Nat'l Wildlife*, 471 Mich at 634-635.

[60] *Id.* at 635 (emphasis in original).

to this issue and remand this case to the trial court for further proceedings consistent with this opinion.

Robert P. Young, Jr.
Clifford W. Taylor
Maura D. Corrigan
Stephen J. Markman

STATE OF MICHIGAN

SUPREME COURT

MICHIGAN CITIZENS FOR WATER
CONSERVATION, R. J. DOYLE, BARBARA
DOYLE, JEFFREY R. SAPP, and SHELLY M.
SAPP,
            Plaintiffs-Appellants/
            Cross-Appellees,

v                                                    Nos. 130802, 130803

NESTLÉ WATERS NORTH AMERICA INC.,
            Defendant-Appellee/
            Cross-Appellant,

and

DONALD PATRICK BOLLMAN and NANCY
GALE BOLLMAN, also known as PAT BOLLMAN
ENTERPRISES,
            Defendants.

_____

WEAVER, J. (*dissenting*).

I dissent from the majority's reversal of the Court of Appeals holding that

plaintiffs have standing to bring a claim under the Michigan environmental

protection act (MEPA)[1] with respect to the Osprey Lake impoundment and

wetlands 112, 115, and 301. I would hold that plaintiffs have standing under

_____

[1] MCL 324.1701 *et seq.*

MCL 324.1701(1)[2] to bring an action to enjoin water pumping and bottling production activities that plaintiffs allege will irreparably harm natural resources. I would therefore affirm the Court of Appeals decision holding that plaintiffs have standing with respect to all the affected properties at issue.

The majority's holding in this case marks the culmination of a line of cases in which the same majority of four (Chief Justice Taylor and Justices Corrigan, Young, and Markman) has eroded Michigan's traditional rules of standing.

Beginning with *Lee v Macomb Co Bd of Comm'rs*,[3] the majority overruled Michigan precedent establishing prudential standing as the traditional doctrine of legal standing in Michigan. In place of Michigan's doctrine of prudential standing, the majority erroneously adopted a constitutional doctrine of standing based on the federal courts' doctrine of standing, as stated in *Lujan v Defenders of Wildlife*.[4]

---

[2] MCL 324.1701(1) states:

> The attorney general or any person may maintain an action in the circuit court having jurisdiction where the alleged violation occurred or is likely to occur for declaratory and equitable relief against any person for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction.

[3] *Lee v Macomb Co Bd of Comm'rs*, 464 Mich 726; 629 NW2d 900 (2001).

[4] *Lujan v Defenders of Wildlife*, 504 US 555; 112 S Ct 2130; 119 L Ed 2d 351 (1992).

In *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*,[5] the majority of four, through lengthy dicta, attacked the statute at issue in this case, MEPA, while stating that the majority was declining to address whether MEPA represented an increase in the power of this Court, because the plaintiffs in that case met the federal constitutional standing doctrine adopted by the majority in *Lee*.

In my *Nat'l Wildlife* concurrence, I wrote: "The majority can wait for a future case that has not drawn public attention to openly and directly declare the MEPA citizen-suit standing provision unconstitutional."[6] Although this case has been highly publicized, the majority held in a less-publicized case, *Rohde v Ann Arbor Pub Schools*,[7] that a statute in which the Legislature purports to grant standing to a citizen beyond that recognized in *Lee* is unconstitutional.

Now, the majority of four has taken this case as the opportunity to finish what it started in *Nat'l Wildlife*: to deprive the people of Michigan of the ability to protect the natural resources of this state. I dissent because the Michigan Constitution does not restrict the ability of the Legislature to grant standing to the citizens of this state. Further, the Michigan Constitution places a broad duty on

---

[5] *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608; 684 NW2d 800 (2004).

[6] *Id*. at 653-654 (Weaver, J., concurring in the result only).

[7] *Rohde v Ann Arbor Pub Schools*, 479 Mich __; __ NW2d __ (Docket No. 128768, decided July 25, 2007).

3

the Legislature to protect the environment, and the Legislature has properly fulfilled its constitutional mandate through its enactment of MEPA.

## I. THE MAJORITY OF FOUR'S ASSAULT ON STANDING IN MICHIGAN

Before *Lee*, no Michigan case had held that the issue of standing posed a constitutional issue.[8] Nor did any case hold that Michigan's judicial branch was subject to the same case-or-controversy limitation imposed on the federal judicial branch under article III of the United States Constitution.[9] In fact, article III standing derived from *Lujan* was not even an issue raised or briefed by the parties

---

[8] Before *Lee*, the Michigan standing requirements were based on prudential, rather than constitutional, concerns. See, generally, *House Speaker v State Administrative Bd*, 441 Mich 547, 559 n 20; 495 NW2d 539 (1993), and Justice Riley's concurrence in *Detroit Fire Fighters Ass'n v Detroit*, 449 Mich 629, 643; 537 NW2d 436 (1995).

[9] As I wrote in my concurrence in *Lee*:

> In *House Speaker* we stated that "this Court is not bound to follow federal cases regarding standing," pointing out that "[o]ne notable distinction between federal and state standing analysis is the power of this Court to issue advisory opinions. Const 1963, art 3, § 8. Under Article III of the federal constitution, federal courts may issue opinions only where there is an actual case or controversy." [*House Speaker*, *supra* at] 559, including n 20. Justice Kennedy, writing for the Court in *ASARCO Inc v Kadish*, 490 US 605, 617; 109 S Ct 2037; 104 L Ed 2d 696 (1989), acknowledged:

> "We have recognized often that the constraints of Article III do not apply to state courts, and accordingly the state courts are not bound by the limitations of a case or controversy or other federal rules of justiciability . . . ." [*Lee*, *supra* at 743 n 2.]

in *Lee*. On its own initiative, the majority of four raised *Lujan's* standing test and erroneously transformed standing in Michigan into a constitutional question.

In *Lee*, a case involving MCL 35.21, the majority adopted the three-part test set out in *Lujan*. The majority, quoting *Lujan*, stated:

> "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical."' Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.' Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" [*Lee*, *supra* at 739, quoting *Lujan*, *supra* at 560-561.]

The majority erroneously adopted the *Lujan* test as a constitutionally based test for standing, under a theory that Const 1963, art 6, § 1, which vests the state courts with "judicial power,"[10] granted the Michigan judicial branch only the same

---

[10] The Michigan Constitution does not define the judicial power. In the majority's attempt to delineate the similarities between the judicial power in Michigan and the federal courts, it quotes *Michigan Chiropractic Council v Comm'r of the Office of Financial & Ins Services*, 475 Mich 363, 369; 716 NW2d 561 (2006), in which the same majority stated: "Our tripartite system of government is constitutionally established in both our state and federal constitutions. US Const, art III, § 1 confers upon the courts only 'judicial power'; US Const, art III, § 2 limits the judicial power to 'cases' and 'controversies.'" The problem with the majority's comparison between Michigan's Constitution and the federal constitution is that only US Const, art III, § 2 sets out a case-or-controversy limitation. Similar to that contained in the Michigan Constitution, the general idea of judicial power contained in US Const, art III, § 1 is very broad. It is then specifically limited by US Const, art III, § 2. The Michigan Constitution contains no such limitation. Thus, the majority misinterprets what the general

(continued…)

5

limited judicial power bestowed on the federal courts under article III of the United States Constitution. Obscuring the fact that the Michigan Constitution contains no corollary to US Const, art III, § 2, the *Lee* majority suggested that Michigan's standing doctrine developed on a parallel track by way of "an *additional* constitutional underpinning."[11] The additional underpinning referred to by the majority is Const 1963, art 3, § 2, which provides that "[t]he powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution."[12]

After overruling Michigan's traditional prudential doctrine of standing in *Lee* by adopting the *Lujan* test, the majority next questioned the Legislature's ability to confer standing on citizens through the use of statutes granting standing when a citizen alleges a specific wrong. In *Nat'l Wildlife*, the majority of four attacked MEPA by stating at length, all in dicta, that the Legislature cannot grant citizens standing. The majority based this argument on the premise that the

_____

(…continue)

federal judicial power entails, and instead defines the power by its own limitations set out in a subsequent section of the federal constitution. To make matters worse, the majority then defines Michigan's judicial power by the federal limitations, even though the Michigan Constitution lacks a similar limitation.

[11] *Lee*, *supra* at 737 (emphasis added).

[12] The legislative branch has the authority to enact laws. Nowhere in the Michigan Constitution does it establish that the Legislature cannot enact laws

(continued…)

6

Legislature would be taking away the power to enforce laws, an essential component of the "executive power," and giving that power to the judicial branch. The majority proudly proclaimed that it was "*resisting* an expansion of power—not an everyday occurrence in the annals of modern government."[13] Unfortunately, that statement was not accurate, because the majority showed its lack of judicial restraint by compromising the Legislature's constitutional duty to enact laws for the protection of the environment and enlarging the Court's capacity to overrule statutes under the guise of the majority's self-initiated, erroneous "constitutional" doctrine of standing.[14]

Further, as the majority mistakenly believed, MEPA does not purport to give the judiciary the power of the executive branch to enforce the laws, because that power is given to the people of Michigan.[15]   A court's role in these cases

_____

(…continue)

granting standing.  Nor does the Michigan Constitution establish that the judicial branch is the sole authority in determining who may have standing.

[13] *Nat'l Wildlife*, *supra* at 639 (emphasis in original).

[14] "[F]aux judicial restraint is judicial obfuscation."  *Federal Election Comm v Wisconsin Right to Life, Inc*, __ US __, __; 127 S Ct 2652; __ L Ed 2d __; 2007 US LEXIS 8515, *88 (2007) (Scalia, J., concurring in part and concurring in the judgment).

[15] It can even be argued that the Legislature did not give any power to the people, because a reading of Const 1963, art 1, § 1 suggests that the people have retained the power, given that the provision states that "[a]ll political power is inherent in the people."

differs in no way from its role in any other controversy that comes before it: the court hears the case, interprets the applicable law, and renders a decision.

By holding that plaintiffs in this case cannot bring suit with respect to the Osprey Lake impoundment and wetlands 112, 115, and 301 pursuant to the standing granted by MEPA, the majority takes away the people's power to ensure protection of Michigan's natural resources. Through MEPA, the Legislature has given "the private citizen a sizable share of the initiative for environmental law enforcement."[16] The majority has taken away that initiative. By basing the decision on faux and inapplicable constitutional principles, short of a constitutional amendment even more explicit than Const 1963, art 4, § 52, the majority has taken away the Legislature's ability to ever give that initiative back to the people.

## II. ART 4, § 52 OF THE MICHIGAN CONSTITUTION

Const 1963, art 4, § 52 creates a duty in the Legislature to ensure that Michigan's natural resources are protected.[17] As I stated in *Nat'l Wildlife*, the

---

[16] *Eyde v Michigan*, 393 Mich 453, 454; 225 NW2d 1 (1975).

[17] Const 1963, art 4, § 52 provides:

> The conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people. The legislature shall provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction.

8

majority completely brushes off and ignores the will of the people to force the Legislature to ensure that the natural resources of this state are protected. I wrote:

> Among the reasons why *Lee's* article III-based standing test or any judge-created standing test should not be applied to MEPA plaintiffs, the most important is that to do so defeats the clear, unambiguous, and readily understandable purpose of art 4, § 52 of the Michigan Constitution.[18] Through art 4, § 52, the people of Michigan directed the Legislature "to provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction." Art 4, § 52 provides that this mandate serves the people's express "paramount concern in the interest of the health, safety and general welfare of the people" specifically with respect to the "conservation and development of the natural resources of the state." Employing the precise words of art 4, § 52, the Legislature enacted MEPA in fulfillment of art 4, § 52's mandate. [*Nat'l Wildlife*, *supra* at 665.]

Before *Nat'l Wildlife*, this Court had noted that the Legislature conferred standing under MEPA to any person who alleges that a defendant's conduct has or is likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust therein.[19]

---

[18] See, e.g., *Michigan Farm Bureau v Secretary of State*, 379 Mich 387, 393; 151 NW2d 797 (1967) (addressing principles of constitutional construction).

[19] See *Ray v Mason Co Drain Comm'r*, 393 Mich 294, 305; 224 NW2d 883 (1975). That MEPA grants standing to "any person" has been unquestioned for more than 30 years. See, also, *Eyde*, *supra* at 454 (1975); *West Michigan Environmental Action Council v Natural Resources Comm*, 405 Mich 741; 275 NW2d 538 (1979); *Kimberly Hills Neighborhood Ass'n v Dion*, 114 Mich App 495; 320 NW2d 668 (1982); *Trout Unlimited, Muskegon-White River Chapter v White Cloud*, 195 Mich App 343; 489 NW2d 188 (1992); *Nemeth v Abonmarche Dev, Inc*, 457 Mich 16; 576 NW2d 641 (1998).

Inexplicably, the majority of four has decided that the very specific mandate of art 4, § 52 requiring the Legislature to protect the natural resources does not allow the Legislature to grant standing to citizens of the state and, instead, has usurped that mandate in place of the federal case-or-controversy limitation specifically placed by the United States Constitution on the federal courts' judicial power. I strongly disagree with the majority because the majority has, mistakenly or intentionally, replaced a clear mandate of the will of the people of Michigan with irrelevant, misinterpreted, and nonbinding federal law. It is a tragic day for Michigan.

## III. APPLICATION

Plaintiff Michigan Citizens for Water Conservation (MCWC) is a nonprofit corporation formed to protect and conserve water resources in Michigan. It consists of approximately 1,300 members; 265 of those members are riparian owners in the Tri-Lakes area of Mecosta County. Among the members are plaintiffs R.J. and Barbara Doyle, who own land on the Dead Stream, and plaintiffs Jeffrey and Shelly Sapp, who own land on Thompson Lake.

In 2002, after receiving the required permits from the Michigan Department of Environmental Quality (DEQ), defendant Nestlé Waters North America Inc. began pumping and bottling water on a 139-acre area on the northern shore of the

10

Osprey Lake impoundment.[20]  The permits allowed defendant to operate the four wells at a combined maximum pumping rate of 400 gallons a minute.

Plaintiffs brought suit under MCL 324.1701(1), alleging that defendant's water pumping and bottling would cause damage to various interconnected streams, lakes, and wetlands north of the Tri-Lakes region.  Specifically, plaintiffs alleged damage to the Osprey Lake impoundment, Thompson Lake, the Dead Stream, and wetlands 112, 115, and 301.  Plaintiffs sought temporary and permanent injunctive relief in the form of preventing defendant from pumping and bottling water in the Tri-Lakes area.  The trial court granted plaintiffs injunctive relief.

On appeal, the Court of Appeals affirmed in part, reversed in part, and remanded to the trial court.[21]  On the issue of standing, a majority consisting of Judges White and Murphy held that plaintiffs had standing to bring claims with respect to all of the natural resources at issue.  The separate opinion written by Judge Murphy, held that

> plaintiffs have standing because of the complex, reciprocal nature of the ecosystem that encompasses the pertinent natural resources noted above and because of the hydrologic interaction, connection, or interrelationship between these natural resources, the springs, the

---

[20] The Osprey Lake impoundment and several of the wetlands at issue in this case are contained within a parcel of land owned by defendants Donald and Nancy Bollman.

[21] *Michigan Citizens for Water Conservation v Nestlé Waters North America Inc*, 269 Mich App 25; 709 NW2d 174 (2005).

aquifer, and defendant Nestlé's pumping activities, whereby impact on one particular resource caused by Nestlé's pumping necessarily affects other resources in the surrounding area. Therefore although there was no evidence that plaintiffs actually used or physically participated in activities on the Osprey Lake impoundment and wetlands 112, 115, and 301, environmental injuries to those natural resources play a role in any harm caused to the Dead Stream, the Dead Stream's wetlands, and Thompson Lake, which are used by and adjacent to property owned by plaintiffs and not the subject of a standing challenge. [*Michigan Citizens*, *supra* at 113.]

The majority now erroneously reverses the Court of Appeals decision on plaintiffs' standing with respect to the Osprey Lake impoundment, and wetlands 112, 115, and 301, holding that "[p]laintiffs failed to establish that they have a substantial interest in these areas, detrimentally affected by Nestlé's conduct, that is distinct from the interest of the general public." *Ante* at 16.

For the reasons stated, I believe that plaintiffs satisfied Michigan's standing doctrine because they complied with MCL 324.1701(1). MCL 324.1701(1) gives standing to any citizen to protect the natural resources of Michigan, pursuant to the constitutional mandate requiring the Legislature to protect natural resources. I would affirm the Court of Appeals decision.

Furthermore, plaintiffs argue that even if MEPA does not grant standing to any citizen to challenge any environmental harm, plaintiffs have met the majority's constitutional standing requirements with regard to the Dead Stream and Thompson Lake and that the United States Supreme Court has in the past stated that "[o]nce this standing is established, the party may assert the interests of

the general public in support of his claims for equitable relief."[22]  While I find that federal standing law is irrelevant to Michigan law and not binding on this Court, I do believe that plaintiffs raise a valid argument.  Plaintiffs point to *Warth v Seldin*, 422 US 490; 95 S Ct 2197; 45 L Ed 2d 343 (1975), in which the United States Supreme Court seemed to contemplate federal standing in a situation similar to that of plaintiffs.  The Court noted:

> In some circumstances, countervailing considerations may outweigh the concerns underlying the usual reluctance to exert judicial power when the plaintiff's claim to relief rests on the legal rights of third parties. See *United States* v. *Raines*, 362 U.S. [17, 22-23; 80 S Ct 519; 4 L Ed 2d 524 (1960)]. In such instances, the Court has found, in effect, that the constitutional or statutory provision in question implies a right of action in the plaintiff. See *Pierce* v. *Society of Sisters*, 268 U.S. 510 [45 S Ct 571; 69 L Ed 1070] (1925); *Sullivan* v. *Little Hungtin Park, Inc.*, 396 U.S. 229, 237 [90 S Ct 400; 24 L Ed 2d 386] (1969).  See generally Part IV, *infra*. Moreover, Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules. Of course, Art. III's requirement remains: the plaintiff still must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants. *E.g.*, *United States* v. *SCRAP*, 412 U.S. 669 [93 S Ct 2405; 37 L Ed 2d 254] (1973).  But so long as this requirement is satisfied, persons to whom Congress has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights and interests of others, and, indeed, may invoke the general public interest in support of their claim. *E.g.*, *Sierra Club* v. *Morton, supra* at 737; *FCC* v. *Sanders Radio Station*, 309 J.S. 470, 477 [60 St Ct 693; 84 L Ed 869 (1940).  [*Id*. at 500-501.]

---

[22] *Sierra Club v Morton*, 405 US 727, 740 n 15; 92 S Ct 1361; 31 L Ed 2d 636 (1972).

Whether dealing with federal constitutional standing or standing granted by statute, I find the rationale in *Warth* to be persuasive when the plaintiffs have established standing for their own claims.

## IV. CONCLUSION

By holding that MEPA does not grant standing to plaintiffs to protect all the resources at issue,

> [t]he majority disregards the intent of the Legislature, erodes the people's constitutional mandate, and overrules 30 years of Michigan case law that held that the Legislature meant what it said when it allowed "any person" to bring an action in circuit court to protect natural resources from actual or likely harm.[23]

The majority of four has now completed what it started in *Lee* and *Nat'l Wildlife*; it has taken the power to protect the state's natural resources away from the people of Michigan, despite the people's stated belief that the natural resources of this state are of paramount concern.

I would affirm the Court of Appeals holding that plaintiffs have standing to bring suit under MEPA, because plaintiffs allege that the defendant's water pumping and bottling activities will irreparably harm Michigan's natural resources.

Elizabeth A. Weaver

---

[23] *Nat'l Wildlife*, *supra* at 652 (Weaver, J., concurring in the result only).

S T A T E   O F   M I C H I G A N

SUPREME COURT

MICHIGAN CITIZENS FOR WATER
CONSERVATION, R. J. DOYLE, BARBARA
DOYLE, JEFFREY R. SAPP, and SHELLY M.
SAPP,

        Plaintiffs-Appellants/
        Cross-Appellees,

v                                                          Nos. 130802, 130803

NESTLÉ WATERS NORTH AMERICA INC.,

        Defendant-Appellee/
        Cross-Appellant,

and

DONALD PATRICK BOLLMAN and NANCY
GALE BOLLMAN, also known as PAT BOLLMAN
ENTERPRISES,

        Defendants.

_____

CAVANAGH, J. (*dissenting*).

I concur fully with Justice Weaver's dissenting opinion because I, too, believe that the majority's systematic dismantling of our standing principles is seriously misguided. Moreover, I would find that plaintiffs properly have standing because the evidence they presented soundly demonstrates that the conduct of Nestlé Waters North America Inc. is perpetrating detrimental environmental effects on the ecosystem about which plaintiffs' complaint is concerned. I reject

the sort of "piecemeal justice" the majority would afford plaintiffs because, in my view, there is no justifiable reason for preventing plaintiffs from holding defendants accountable for actions that affect this intricately connected area. I would recognize that, at the very least, areas a citizen does not use—but that are perceptibly affected by the same conduct that is affecting the areas the citizen does use—are encompassed within the citizen's right to pursue a claim against the offending actor.[1] See *Lujan v Defenders of Wildlife*, 504 US 555, 566; 112 S Ct 2130; 119 L Ed 2d 351 (1992) (rejecting standing only for "persons who use portions of an ecosystem not perceptibly affected by the unlawful action in question").[2]

Only in this way can we attempt to fully ensure the protection of our environment. It is for this reason that I reject the majority's statement that "[w]hat we have done is recognized an established constitutional line on our judicial authority to adjudicate what would otherwise be public policy-oriented lawsuits brought by persons who have no immediate stake in the controversy." *Ante* at 30. I do not agree that lawsuits brought to vindicate environmentally detrimental conduct are merely "public policy-oriented," nor do I agree that when an

---

[1] Such a restriction would alleviate the majority's grave concern about "anyone but a Martian" attaining standing with respect to environmental protection claims in Michigan. See *ante* at 19.

2

ecosystem of which a person seeking standing is a part is suffering perceptible degradation, the person has no "immediate stake in the controversy." The divergence between the majority's viewpoint and my own stems from what is clearly a fundamentally different assessment of the interconnectedness of people and the environment in which we live.

Michael F. Cavanagh

_____
(…continue)

[2] It should be clear that by appropriating an insightful proposition from *Lujan*, I am not endorsing the balance of the *Lujan* Court's standing analysis. See *ante* at 14 n 29.

S T A T E   O F   M I C H I G A N

SUPREME COURT

MICHIGAN CITIZENS FOR WATER
CONSERVATION, R.J. DOYLE,
BARBARA DOYLE, JEFFREY R. SAPP,
and SHELLY M. SAPP,

       Plaintiff-Appellants/
       Cross-Appellees,

v                                 Nos. 130802, 130803

NESTLÉ WATERS NORTH AMERICA
INC.,

       Defendant-Appellee/
       Cross-Appellant,

and

DONALD PATRICK BOLLMAN and
NANCY GALE BOLLMAN, also known as
PAT BOLLMAN ENTERPRISES,

       Defendants.

_____

KELLY, J. (*dissenting*).

The sole issue we decide is whether plaintiffs have standing to challenge the effects of pumping activities by defendant Nestlé Waters North America Inc. on the Osprey Lake Impoundment and wetlands 112, 115, and 301.  The majority holds that plaintiffs have failed to establish standing to challenge the pumping in these areas.  In dissent, Justice Weaver reaches the opposite conclusion.  In so

doing, she rejects the standing test adopted by the majority in *Lee v Macomb Co Bd of Comm'rs*[1] and *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co.*[2] While I agree with Justice Weaver's conclusion and her analysis of these decisions, I also recognize that *Lee* and *Cleveland Cliffs* now constitute binding precedent of this Court. And because I would hold that plaintiffs have established standing under *Lee* and *Cleveland Cliffs,* I find it unnecessary to consider whether these decisions should be overruled.

FACTS

This case involves a number of interconnected bodies of water in Mecosta County, Michigan. The Osprey Lake impoundment (Osprey Lake) is a man-made body of water created by damming the Dead Stream. South of Osprey Lake is Thompson Lake. Wetlands 112, 115, and 301 are located to the west and north of Osprey Lake. The wetlands, the Dead Stream, and the lakes are directly connected to and part of the same shallow, unconfined spring aquifer.

In December 2000, defendant Nestlé purchased the groundwater rights to the area known as Sanctuary Springs, located to the north of Osprey Lake. Shortly afterwards, it announced plans to build a spring water bottling plant. Plaintiff

[1] 464 Mich 726; 629 NW2d 900 (2001).

[2] 471 Mich 608; 684 NW2d 800 (2004).

2

Michigan Citizens for Water Conservation (MCWC) was formed then to represent the interests of the riparian property owners in the area. MCWC has over 2,000 members, including plaintiffs R.J. and Barbara Doyle, who own land on the Dead Stream, and plaintiffs Jeffrey and Shelly Sapp, who own land on Thompson Lake.

In 2001, Nestlé installed four wells on the Sanctuary Springs property. The combined maximum pumping rate permitted for the wells was 400 gallons a minute. Later that year, plaintiffs filed their complaint. The complaint consisted of (1) a claim for an injunction, (2) a claim that withdrawal of water violated the common law applicable to riparian water rights, (3) a claim that the withdrawal violated the common law applicable to groundwater, (4) a claim that the water of Sanctuary Springs is subject to the public trust doctrine, (5) a claim that Nestlé's use of the water would be an unlawful taking, and (6) a claim that the water extractions violated the Michigan Environmental Protection Act (MEPA). MCL 324.1701 *et seq*.

A trial was held on the groundwater and MEPA claims only. It lasted 19 days, and the transcript contains more than 3,700 pages. Ultimately, the trial court held that plaintiffs had stated a prima facie case under MEPA with respect to Osprey Lake, Thompson Lake, the Dead Stream, the Dead Stream wetlands, and wetlands 115, 112, and 301. The court found the appropriate remedy to be an injunction against all pumping operations at the site.

In reaching its decision, the trial court made a number of findings of fact. It found that, for every gallon of water diverted or removed by the pumping, there is a corresponding loss of water to Osprey Lake, the Dead Stream, Thompson Lake, and the wetlands. It found that the pumping activities would cause Dead Stream's surface level to drop two inches and that the Dead Stream wetlands would lose at least 2 inches. It found that wetland 115 would suffer a drop in water level of 1.5 feet, wetland 112 would drop at least 3 inches, and wetland 301 would drop 2 to 4 inches. And it found that Osprey Lake and Thompson Lake would drop by as much as 6 inches. The court found that the result would be that the Dead Stream's use as a fishery and recreational area would be reduced; that the bottom of the wetlands would become exposed, which could cause the areas to become choked with vegetation; and that a level-control structure would need to be installed to maintain the lakes' water levels.

Defendants appealed from the trial court's injunctive order, arguing, among other things, that plaintiffs lacked standing with respect to Osprey Lake and wetlands 112, 115, and 301. Writing for a divided court, Judge Murphy concluded that plaintiffs had standing to assert MEPA claims over all the areas identified by the trial court. *Michigan Citizens for Water Conservation v Nestlé Waters North America Inc*, 269 Mich App 25, 113; 709 NW2d 174 (2005) (opinion by Murphy, J.).

4

Judge Smolenski dissented on the standing issue. He would have found that plaintiffs do not have standing to assert claims over Osprey Lake and wetlands 112, 115, and 301. He believed that, in regard to these areas, plaintiffs had not suffered harm that was different from the citizenry at large. *Id.* at 83 (opinion by Smolenski, J.).

Both sides applied for leave to appeal in this Court. We scheduled oral argument on the applications, directing the parties to address "only whether the plaintiffs have standing under *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608 (2004), to bring claims related to the Osprey Lake impoundment and wetlands 112, 115, and 301." 477 Mich 892 (2006).

THE STANDING ISSUE

In *Lee v Macomb Co Bd of Comm'rs*, this Court expressly adopted the standing test articulated by the United States Supreme Court in *Lujan v Defenders of Wildlife*, 504 US 555; 112 S Ct 2130; 119 L Ed 2d 351 (1992). The test has three elements:

> "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical."'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court.' Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" [*Lee*, 464 Mich at 739, quoting *Lujan*, 504 US at 560-561.]

5

In *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, this Court re-affirmed *Lee*'s adoption of the *Lujan* test and applied the three factors to environmental plaintiffs. *Nat'l Wildlife Federation,* 471 Mich at 628-629.

The resolution of the case before us turns on the correct application of the injury-in-fact component of the test. In applying that component, the majority overlooks a basic purpose of the standing doctrine. As stated in *Nat'l Wildlife Federation*, the purpose of requiring plaintiffs to show injury in fact is to ensure that "a genuine case or controversy [exists] between the parties, one in which there is a real, not a hypothetical, dispute." *Nat'l Wildlife Federation*, 471 Mich at 615. See *ante* at 12. However, the injury-in-fact requirement is not meant to prevent plaintiffs from protecting the public interest when the concerns underlying the requirement have been satisfied. The United States Supreme Court has instructed:

> [S]o long as the [standing] requirement is satisfied, persons to whom [the Legislature] has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights and interests of others, and, indeed, may invoke the general public interest in support of their claim. [*Warth v Seldin*, 422 US 490, 501; 95 S Ct 2197; 45 L Ed 2d 343 (1975).]

The federal courts have consistently applied the principle that, once a plaintiff has established standing to challenge an activity, that plaintiff also has standing to invoke the general public interest. In *Citizens Committee Against Interstate Route 675 v Lewis*,[3] the plaintiffs alleged that the defendants' plan to

---

[3] 542 F Supp 496 (SD Ohio, 1982).

build a segment of I-675 violated the National Environmental Policy Act (NEPA). 542 F Supp at 522. The defendants conceded that plaintiff Mione had standing to challenge the construction of the highway because he used the land that would be taken to build the road. *Id.* at 523. However, the defendants claimed that the plaintiffs had no standing to challenge the "socio-economic impacts upon the City of Dayton, because [neither Mione nor any of the other plaintiffs had claimed injury] which arises from that act." *Id.* The court disagreed, concluding that, since plaintiff "Mione has standing to advance his environmental injury in fact, it is clear, . . . that Mione has standing, based upon the public interest, to raise other alleged inadequacies of the [final environmental impact statement], including . . . the socio-economic impacts of I-675 upon the City of Dayton." *Id.* at 524.

Likewise, in *Sierra Club v Adams*,[4] the plaintiffs brought suit seeking an injunction to stop the government from constructing a highway because the government had failed to prepare an environmental impact statement. The defendants conceded that the plaintiffs had standing to challenge the failure to adequately consider the potential spread of aftosa.[5] But the defendants argued that the plaintiffs did not have standing to challenge the failure to consider the effect of the construction on the Cuna and Choco Indians. *Id.* at 149. Considering this

_____

[4] 188 US App DC 147, 148; 578 F2d 389 (1978).

argument, the court found that the plaintiffs had not alleged that the government's failure to consider the effect of construction on the Indian tribes caused any specific harm to them. *Id.* at 149-150. Nonetheless, the court decided that, because the plaintiffs had standing to challenge the action on at least one ground, they could also raise other inadequacies in the environmental impact statement. These included the failure to consider the effects on the Indian tribes. *Id.* at 150.

In *Alaska Ctr for the Environment v Browner*,[6] the plaintiffs brought suit to compel the Environmental Protection Agency (EPA) to establish total maximum daily loads (TMDLs) for Alaskan waters. *Id.* at 982. The EPA challenged the lower court's statewide remedy, claiming that the plaintiffs had demonstrated an injury in fact with respect to only a limited number of waters in the state. *Id.* at 984. According to the EPA, it was proper to order it to establish TMDLs only for the bodies of water that the plaintiffs actually used. The Court of Appeals for the Ninth Circuit rejected this argument, concluding that the plaintiffs could challenge the failure to establish TMDLs on the basis of how the EPA's actions affected them. But the plaintiffs could challenge the failure, also, on the basis of the total effect of the EPA's actions. *Id.* at 985. The court explained that, once standing is established, "'the appropriate scope of the remedy goes to the merits of plaintiffs'

_____
(…continue)

[5] Aftosa is also known as foot-and-mouth disease. *Id.* at 149.

[6] 20 F3d 981 (CA 9, 1994).

8

claims and is ultimately limited by the statutory authority,'" not by the standing doctrine.[7] *Id.* (citation omitted).

This discussion illustrates that, once a plaintiff has standing to challenge contested activity, it can raise other inadequacies on the basis of the public interest.[8] As the majority concedes, plaintiffs have standing to challenge the pumping on the basis of its effects on the Dead Stream and Thompson Lake. Because plaintiffs have standing to challenge that pumping, they can assert not only their own interests but also the interests of the general public.[9] Therefore, plaintiffs have standing to assert a MEPA claim challenging the total effects of the pumping, including its effects on Osprey Lake and wetlands 112, 115, and 301.[10]

---

[7] See also *American Littoral Society v Environmental Protection Agency*, 199 F Supp 2d 217 (D NJ, 2002) (ruling that the plaintiffs had standing to object to the EPA's failure to establish TMDLs for New Jersey waters); *Sierra Club v Browner*, 843 F Supp 1304 (D Minn, 1993) (ruling that the plaintiffs had standing to object to the EPA's failure to establish TMDLs for Minnesota waters).

[8] I recognize that this Court is not bound by federal caselaw. But specifically because the standing test set forth in *Lee* and *Cleveland Cliffs* is derived from federal law, I find federal standing decisions instructive here.

[9] The majority claims that I do not define "the general public interest." *Ante* at 24 n 50. As I think is obvious, "the general public interest" here is preventing the destruction of our environment.

[10] The majority portrays my position as creating a loophole in standing jurisprudence. It states that I believe that plaintiffs can assert a claim invoking the general public interest even when they do not have standing. This is incorrect. It is only if plaintiffs have standing to challenge the activity at issue that they can assert the general public interest. In this case, plaintiffs have standing to challenge

(continued…)

9

The majority disagrees and determines that plaintiffs cannot assert the general public interest in support of their claim because they do not have standing to assert a claim. This decision contradicts other findings in the majority opinion. The majority concedes that plaintiffs have standing to challenge the pumping as it relates to the Dead Stream and Thompson Lake. As a result, the majority necessarily decides that plaintiffs have a claim under MEPA. Simultaneously, however, the majority concludes that plaintiffs cannot invoke the general public interest in support of their MEPA claim because plaintiffs do not have a claim under MEPA.[11]

The majority also finds that the statement from *Warth* on which I rely is dictum. The statement in *Warth* echoes similar statements from earlier United States Supreme Court decisions. See *Sierra Club v Morton,* 405 US 727, 740 n 15; 92 S Ct 1361; 31 L Ed 2d 636 (1972); *Fed Communications Comm v Sanders Bros Radio Station*, 309 US 470, 477; 60 S Ct 693; 84 L Ed 869 (1940). It would be odd for the Supreme Court to repeatedly rely on this statement in its decisions if it did not consider the statement to be a binding rule of law. Moreover, numerous federal cases that I have discussed proceed as if the statement from

_____

(…continue)
the pumping. Accordingly, they can also invoke the general public interest to challenge all effects of the pumping on the environment.

10

*Warth* is a holding.  E.g., *Lewis*, 542 F Supp at 523; *Adams*, 578 F2d at 392.  If the federal courts treat the statement as precedent, there is every reason for this Court to do so, as well.[12]

The majority implies that the federal cases I discuss should be ignored because the statement I rely on from *Warth* is unique to the area of federal administrative law.  There are numerous fallacies in this position.  First, a large number of federal standing decisions, notably *Lujan v Defenders of Wildlife*, are from cases in which one party is a governmental entity.  Thus, it is not surprising that the decisions I discuss include some of these cases.  What the majority fails to demonstrate is that the United States Supreme Court has separated its law regarding standing in administrative law cases from its law regarding standing in other cases.

---

(…continue)

[11] By finding that these plaintiffs cannot invoke the general public interest, the majority essentially finds that no plaintiff can invoke the general public interest.

[12] In support of its claim that the statement from *Warth* is dictum that need not be followed, the majority cites criticism of *Warth* by Justices Thomas and Scalia.  But unless the majority can show that three other justices share the view of Justices Thomas and Scalia, it has no bearing on the continuing viability of *Warth* and, frankly, is irrelevant.

11

Second, there is no principled reason for this Court to make such a distinction. In *Warth*, the plaintiffs challenged a zoning ordinance of the defendant town, claiming that the ordinance violated their constitutional rights by excluding persons of low income from living in the town. 422 US at 493. In this case, plaintiffs claim that Nestlé's pumping has injured them by harming the environment. The majority has not explained the relevance of the fact that, in *Warth*, the defendant is a governmental entity and here, the defendant is a private corporation. In short, the majority has advanced no principled reason for refusing to apply to this case standing decisions from cases where the defendant is a governmental entity.

By refusing to follow the federal decisions that I discuss, the majority indulges in a serious inconsistency. For example, in this case and in *Rohde v Ann Arbor Pub Schools*,[13] which also was decided today, the majority finds that plaintiffs lacked standing, despite the fact that they would have standing under federal law.

But Michigan's current standing test is derived exclusively from federal law. Hence, it should follow that plaintiffs in the instant case and the plaintiffs in *Rohde* have standing. The majority has adopted only a portion of federal standing law. It would seem rational that either Michigan's standing law is consistently the

---

[13] 479 Mich ___; ___ NW2d ___ (Docket No. 128768, decided July 25, 2007).

same as federal standing law or it is consistently different. If it is the same, the majority should accept and follow the decisions I have relied on here. If it is different, then there is no reason to follow other federal standing decisions, including *Lujan*. The majority should settle on one consistent approach to standing.

THE MAJORITY'S SEPARATION OF POWERS ARGUMENT

One final point merits addressing. The majority claims that my interpretation of *Warth* cannot be correct because it "would violate the separation of powers principles upon which . . . standing requirements rest." *Ante* at 27 n 55. I disagree.

It is uncontested that plaintiffs have standing to assert a MEPA claim challenging defendant Nestlé's pumping. Accordingly, the issue is not whether plaintiffs have standing to assert a claim under MEPA. The issue is the proper scope of the claim. And the answer is that, because plaintiffs have standing to challenge the pumping, "'the appropriate scope of the remedy goes to the merits of plaintiffs' claims and is ultimately limited by the statutory authority,'"[14] not by the standing doctrine. The majority's decision to limit the scope of plaintiffs' cause of action on the basis of standing actually undermines the separation of powers. By

---

[14] *Browner,* 20 F3d at 985 (citation omitted).

13

extinguishing a valid cause of action, the majority usurps power rightly belonging to the Legislature.

This Court has recognized that the injury-in-fact component of the standing doctrine is necessary to prevent "the judicial branch [from establishing itself] as first among equals, being permitted to monitor and supervise the other branches, and effectively possessing a generalized commission to evaluate and second-guess the wisdom of their policies." *Cleveland Cliffs*, 471 Mich at 616. Injury in fact is the factor that separates hypothetical policy disputes from genuine cases or controversies. *Id.* at 615. By requiring a plaintiff to establish an injury in fact, the courts ensure that they do not overstep their bounds by deciding an issue that rightly belongs to another branch of government. *Id.* at 616-617.

But once a plaintiff has established standing to challenge the activity at issue, the concern that the judiciary is overstepping its bounds disappears. This is because after a plaintiff has shown that the activity caused him or her an injury in fact, any concern that the court is getting dragged into a hypothetical policy dispute evaporates. Rather, a legitimate controversy then exists between the parties, one that the courts can properly resolve. As the United States Supreme Court has stated, "[t]he test of injury in fact goes only to the question of standing to obtain judicial review. Once this standing is established, the party may assert the interests of the general public in support of his claims . . . . " *Sierra Club,* 405 US at 740 n 15. Therefore, once a plaintiff has standing to challenge a given

activity, it is not the court's place to decide whether the Legislature's grant of a broad cause of action is wise. The Court's role is simply to adjudicate the dispute.

The law of standing is meant to limit courts to deciding actual cases and to keep them out of the business of "prescribing how the other two branches should function . . . ."[15] Today, a majority of this Court oversteps its bounds by telling the Legislature how it should function. It fails to exercise appropriate judicial self-restraint. It extinguishes a valid cause of action for no reason other than its belief that the cause of action granted by the Legislature is too broad. Sadly, the majority does not recognize that this decision is not its to make.

CONCLUSION

Properly applied, the standing doctrine is a shield used to protect the integrity of our tripartite system of government. In its decision today, the majority allows defendant Nestlé to use the doctrine as a sword to insulate its questionable activity from legal challenge. I dissent from this erroneous decision.

Marilyn Kelly

---

[15] Scalia, *The doctrine of standing as an essential element of the separation of powers*, 17 Suffolk U L R 881, 894 (1983).

15